UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| AIRELL JOSHUA THOMAS SAWYER,<br>Petitioner,<br>v.<br>WARDEN BAKER, *et al.*,<br>Respondents. | Case No. 3:16-cv-00627-MMD-CSD<br>ORDER |

## I. SUMMARY

Petitioner Airell Joshua Thomas Sawyer, a Nevada state prisoner, filed a Fourth Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. (ECF No. 98 ("Fourth Amended Petition").)[1] This habeas matter is before the Court on Respondents' Motion to Dismiss (ECF No. 122 ("Motion")), Petitioner's Motion for Leave to File Excess Pages (ECF No. 127), Petitioner's Motion for Hearing (ECF No. 128), and Petitioner's Motion to Extend (ECF No. 136). For the reasons discussed below, Respondents' Motion is granted, in part, and denied, in part.

## II. BACKGROUND

### A. Procedural History

Sawyer challenges a 2006 conviction and sentence imposed by the Second Judicial District Court for Washoe County. He entered a guilty plea for first degree murder with use of a deadly weapon. (ECF No. 105-5.) The state district court sentenced Sawyer to an aggregate term of 40 to 100 years. (*Id.*) Sawyer did not file a direct appeal.

On July 26, 2007, Sawyer filed a *pro se* state habeas petition. (ECF No. 105-12.) Following an evidentiary hearing and extensive proceedings, on April 10, 2015, the state district court denied his state habeas petition. (ECF No. 114-3.) The Nevada Supreme

[1]Sawyer responded (ECF No. 126) and Respondents replied (ECF No. 133).

Court affirmed the denial relief on appeal. (ECF No. 115-4.) On November 10, 2020, Sawyer filed a counsel second state habeas petition that was dismissed. (ECF Nos. 115-20, 118-10.) The Nevada Court of Appeals affirmed the denial of Sawyer's second state habeas petition as untimely, successive, and procedurally barred, finding that he failed to demonstrate good cause to excuse procedural default. (ECF No. 119-10.)

In October 2016, Sawyer initiated the instant federal habeas proceedings. (ECF No. 6.) Following appointment of counsel, he filed first, second, and third amended petitions. (ECF Nos. 9, 23, 85.) In October 2022, the Court granted the parties' request to stay the case. (ECF Nos. 90, 91.) After Sawyer's motion to reopen was granted, he filed his Fourth Amended Petition. (ECF No. 98.)

Respondents move to dismiss the Fourth Amended Petition as untimely and argue that Grounds 1(A) and 2(E) do not relate back to Sawyer's timely filed petition. (ECF No. 122 at 6-7.) Respondents also argue that Grounds 1(A), 1(B), 2(B), 2(D), and 2(E) are unexhausted, that Grounds 2(D) and 2(E) are procedurally defaulted, and that Grounds 2(A), 2(C), 2(D), and 2(E) are barred by *Tollett v. Henderson*, 411 U.S. 258 (1973). (*Id.* at 7-14.)

Sawyer argues that he can overcome any procedural hurdle because he can demonstrate that he is actually innocent. (ECF No. 126 at 7-24.) He also asserts that all of his claims relate back to his timely first amended petition, that his claims are exhausted, that he can overcome procedural default based on ineffective assistance of postconviction counsel, and that his claims are cognizable under *Tollett*. (*Id.* at 24-41.)

**B. Actual Innocence Allegations**

After Sawyer moved to Reno, Nevada, he met Stephen Tully ("Stephen") who was about 17 years older than Sawyer. (ECF No. 98 at 4.) Sawyer alleges that Stephen was abusive, manipulative, that Stephen exerted control over Sawyer, that Stephen was violent toward Sawyer, and that Sawyer and Stephen's relationship included sexual components. (*Id.*; ECF No. 126 at 11.) Sawyer and Stephen got matching neck tattoos that read "W.W.K.I.T," which stood for "we will kill in time." (ECF No. 126 at 11.)

Sawyer met Jeffrey Sockwell ("Sockwell"), who would sell Sawyer pain pills. (*Id.*) Sawyer would sometimes exchange meth for pain pills and would occasionally do drugs with Sockwell. (*Id.*) Sockwell and Stephen did not like each other. (*Id.*) On February 14, 2006, Sawyer and Stephen spent the day together. (*Id.* at 12.) Sawyer wanted to smoke meth with Sockwell. Stephen said that he wanted to kill Sockwell. Both Sawyer and Stephen went to a convenience store to buy gloves for Stephen to use during the murder. (*Id.*) Stephen and Sawyer went to Sockwell's home, hung out at his apartment, and watched television as Sawyer and Sockwell smoked meth. (*Id.*)

Suddenly, Stephen jumped up and started to choke Sockwell. (*Id.*) Sawyer was shocked, ran to the closet, and stood there. (*Id.*) Stephen twisted Sockwell's head around until it made a popping sound. (*Id.*) Stephen stomped on Sockwell's chest, choked him some more, then continued to twist his head. (*Id.*) Stephen instructed Sawyer to get him a knife. (*Id.*) Sawyer insisted that they leave, but Stephen threatened to cut Sawyer's neck tattoo off if Sawyer didn't get him a knife. (*Id.* at 12-13.)

Sawyer gave Stephen his pocketknife. (*Id.* at 13.) Stephen began to saw into Sockwell's neck, then ordered Sawyer to do the same. (*Id.*) Sawyer alleges that he "faked it," then Stephen resumed cutting. (*Id.*) Stephen then forced Sawyer to stab Sockwell in the chest, and Sawyer complied. (*Id.*)

Sawyer and Stephen collected items from Sockwell's apartment. (*Id.*) Stephen instructed Sawyer to write a note to leave at the scene, which stated "This is what happens to ~~girls~~ people who sell drugs to 12-year-old girls. We're the equalizers. If the cops won't handle it, we will." (*Id.*) Stephen threatened Sawyer to keep quiet about the murder, or Stephen would rape, torture, and kill Sawyer's family and friends. (*Id.*)

The police interrogated Sawyer and Sawyer lied to the police because Stephen threatened him. (*Id.*) Sawyer agreed to give the police a DNA sample and took a polygraph test. (*Id.*) After the polygraph and DNA sample, Sawyer went with Stephen to speak to Stephen's cousin, Bryan Tully ("Bryan"). (*Id.* at 14.) Although Sawyer wanted Stephen to confess to the police, Stephen and Bryan suggested that Sawyer should "take

the fall" for Stephen, because Stephen had a long prior criminal record. (*Id.*) Stephen suggested that Sawyer could "fake an insanity defense." (*Id.*) Stephen and Bryan told Sawyer that if he turned himself in, they would get him a good lawyer, put money on his inmate account, and help his pregnant girlfriend. (*Id.*) However, if Sawyer told the police the truth, Stephen promised he would retaliate. (*Id.*) Sawyer alleges that based on his love and fear of Stephen, Sawyer went to the police to falsely confess. (*Id.*)

### C. Newly Presented Evidence Produced During State Habeas Proceedings

#### 1. Evidentiary Hearing Testimony

During the proceedings for Sawyer's first state habeas petition, Sawyer's friends, family, and co-workers testified regarding Sawyer's relationship with Stephen. Three witnesses testified at a sealed evidentiary hearing regarding statements made by Stephen that he was the true culprit of the murder. The witnesses were hesitant to testify because they were afraid of what Stephen might do to them, so the state district court held a sealed hearing. Three confidential witnesses testified that Stephen committed the murder and that Sawyer took the blame for it.

Sawyer's sister, Jessica Adine ("Adine"), testified as to a phone conversation she had with Sawyer shortly before he confessed to the police. While Sawyer was explaining he was going to turn himself in, Adine heard someone in the background telling Sawyer what to say. (ECF No. 108-6 at 32-34.) Adine realized it was Stephen's voice in the background telling Sawyer what to say over the phone.

Another witness, Anthony Thomas ("Thomas"), was a manager at a bar where Stephen and Sawyer worked together. He described Sawyer as submissive toward Stephen, that Stephen was more aggressive, and that Thomas was intimidated by Stephen. (ECF No. 107-2 at 13-16.) Thomas testified that he witnessed Sawyer and Stephen rough-housing once, that Stephen pulled a knife and held it against Sawyer's neck, and that the rough-housing seemed sexual in nature. (*Id.* at 16.)

**2. Expert Opinions**

Three experts testified regarding Sawyer's psychological issues and childhood abuse. Dr. Bittker, an expert in forensic psychiatry, testified that he diagnosed Sawyer as having borderline personality disorder and post-traumatic stress disorder. (ECF No. 112-1 at 227-31.) He testified that Sawyer had an abusive relationship with his father and that contributed to Sawyer being dependent on Stephen. (*Id*. at 237-38.)

Dr. Mahaffey, an expert in clinical psychology, did not testify, but agreed that Sawyer suffered from post-traumatic stress disorder and borderline personality disorder. (ECF No. 79-17 at 16.) She found that Sawyer's childhood and mental health issues led him to be "perpetually searching for the loving and approving father-figure he never had." (*Id*. at 19.)

Dr. Davis, an expert in false confessions, found that Sawyer was vulnerable to anyone who showed him attention and love. (ECF No. 79-18 at 3.) Dr. Davis would have testified that Sawyer's purported reasons for confessing falsely are consistent with known causes of false confession. (*Id*. at 10.) Dr. Davis would have testified that Sawyer possessed a number of vulnerabilities that made him more susceptible to the influence of Stephen. (*Id*. at 11.)

**3. Jail Calls**

While detained, Sawyer spoke on the phone with Stephen. During one conversation, Sawyer expressed concern that the State would seek the death penalty. Stephen replied that if that happened, Stephen would "have to die with you." (ECF No. 79-28 at 8.) Stephen asked Sawyer if there was anyone else with Sawyer during the murder and Sawyer acknowledged that someone else was there. (*Id*. at 10.) Sawyer asked Stephen if he should incriminate the other person, but that Sawyer wouldn't unless Stephen told him to. (*Id.* at 12-13.) Sawyer stated that the person "should be man enough to just turn himself in to help me out." (*Id*. at 13.) Stephen remarked that he thinks Sawyer is taking the blame and it would help Sawyer's case if he incriminated the other person.

(*Id*. at 14.) Stephen stated that he would leave it up to the other person to turn themselves in. (*Id*.)

During another call with Stephen, Sawyer stated that the police think there was a second person at the scene and that Sawyer was protecting that person. (ECF No. 79-24 at 5.) Sawyer commented that he has pressure to incriminate the other person and that it was hard on him. (*Id*. at 8.) Stephen stated that maybe the other person would commit suicide and leave a note with a confession. (*Id*. at 10.) Sawyer replied that he hoped the other person loved him enough to do that. (*Id*.) Stephen said he is sure that the other person did, and Sawyer said he knew that. (*Id*.)

In another conversation, Sawyer stated that the culprit had a kind of unusual name that started with a "D." (ECF No. 79-25 at 11.) One of Stephen's aliases is "Dimitrias." (ECF No. 79-11 at 2.) Sawyer stated that he did not think he could incriminate the other person, because he doesn't think they would ever forgive him, and that would hurt Sawyer. (ECF No. 79-25 at 11.) Stephen asked if the culprit's family was connected, and Sawyer answered affirmatively. (*Id*. at 12.) Sawyer alleged that Stephen had previously told Sawyer that his family was connected to the mafia. (ECF No. 106-4 at 86.) Sawyer testified that he was asking Stephen to admit his guilt through these phone calls in inconspicuous ways because the calls were recorded.

While detained, Sawyer also spoke to his sister, Adine, frequently. Sawyer alleges that although they don't refer to Stephen by name, he and his sister discussed Stephen. During one conversation, Adine suggests that Sawyer shouldn't be afraid to come forward, because if Stephen went to prison, Stephen would be housed in another facility. Sawyer commented that it wouldn't matter where he was housed in the state because Stephen had connections with inmates. (ECF Nos. 79-31 at 4; ECF No. 79-30 at 6-7.) During another call with Adine, Stephen stated he would have been willing to take the fall for five or ten years because he loves this person, but he was also afraid of that person because he saw what that person did. (ECF No. 79-29 at 7.)

Sawyer called his father and explained what was happening. He explained that he was under the negative influence of someone, that Stephen committed the murder, and Sawyer helped him cover it up. (ECF No. 26.) Because the police were suspicious of Stephen, he asked Sawyer to take the fall. (*Id.*) Sawyer felt that he had no option, because Stephen would have killed him if he didn't comply. (*Id.*)

### D. Newly Presented Evidence Produced During Federal Habeas Proceedings

Stephen, Stephen's cousin, Bryan, and Stephen's father, Armando, testified. During Stephen's deposition, Stephen invoked the Fifth Amendment privilege against self-incrimination to almost all questions, including questions whether Stephen committed the murder and coerced Sawyer to falsely confess. (ECF No. 60-3.) Bryan testified that Stephen and Sawyer came into his office one day unannounced and that Stephen told him, "We need to talk. . . . We hurt somebody." (ECF No. 60-4 at 67.) Bryan testified that he told them if they did something, to turn themselves in, and to get out of his office. (*Id.* at 68-69.) He further testified that Stephen did not ask him what to do, and that Stephen did not consult with him. (*Id.* at 79-80.) Bryan testified that Stephen told him that his tattoo stood for "We will kill in time," and that Bryan did not consider the tattoo odd because Stephen was an addict and a storyteller. (*Id.* at 17-18.) Armando testified that he never had conversations with Stephen about the case. (ECF No. 79-44.) Stephen, however, had commented to Sawyer that he discussed Sawyer's case with Armando.

## III. DISCUSSION

### A. Actual Innocence

A convincing showing of actual innocence may enable habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. *See Schlup v. Delo*, 513 U.S. 298, 314-16 (1995). "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, [or] expiration of the statute of limitations." *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citation modified). "[I]f a petitioner . . . presents evidence of innocence so strong

that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. However, the Supreme Court has cautioned that "tenable actual-innocence gateway pleas are rare." *McQuiggin,* 569 U.S. at 386 (quoting *Schlup*, 513 U.S. at 329); *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasizing that the *Schlup* standard is "demanding" and seldom met).

To demonstrate actual innocence, "a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt.'" *Majoy v. Roe*, 296 F.3d 770, 776 (9th Cir. 2002) (quoting *Schlup*, 513 U.S. at 327). Put another way, "actual innocence" is established when, in light of all the evidence, "it is more likely than not that no reasonable juror would have convicted [the petitioner]." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup*, 513 U.S. at 327-28).

The petitioner must establish factual innocence of the crime, not mere legal insufficiency. *Id.*; *Jaramillo v. Stewart*, 340 F.3d 877, 882-83 (9th Cir. 2003). To demonstrate actual innocence to overcome a procedural bar under *McQuiggin* and *Schlup*, a petitioner must present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. To be "new" for purposes of an actual-innocence claim, the evidence need only be "newly presented," i.e., "reliable evidence" "that was not presented at trial," as opposed to "newly discovered" and thus previously unavailable. *Griffin v. Johnson*, 350 F.3d 956, 961-63 (9th Cir. 2003). Actual-innocence review incorporates "all evidence," including (i) evidence alleged to have been improperly admitted (but with due regard to its questionable reliability), (ii) evidence tenably claimed to have been wrongfully excluded by the trial court, (iii) evidence the defense did not present to the jury at trial, or (iv) evidence that became available only after the trial. *Id*. (citing *Schlup*, 513 U.S. at 327-28).

The Supreme Court has recognized the possibility of actual innocence in the guilty plea context, but in only in a case where there was a retroactive intervening change in the law. *See Bousley v. United States*, 523 U.S. at 623-24. In one case, the Ninth Circuit assumed that a claim of actual innocence was available to a petitioner who plead guilty but declined to resolve the issue because the petitioner failed to meet the *Schlup* standard. *See Smith v. Baldwin*, 510 F.3d 1127, 1140 & n.9 (9th Cir. 2007).

Sawyer alleges that although he was present when Sockwell was murdered, Stephen committed the murder. Because of Stephen's dominance and control over Sawyer, and Sawyer's love and fear of Stephen, Sawyer alleges that Stephen convinced him to plead guilty on Stephen's behalf. He alleges that his guilty plea was not knowing, voluntary, or intelligent, but was the product of threats and coercion by Stephen.

The newly presented evidence, however, does not demonstrate that it is more likely than not that no reasonable juror would have found Sawyer guilty beyond a reasonable doubt. Although Sawyer presents a theory that he was not the person who committed the murder that he could have presented at trial, the evidence he relies upon falls below that needed to establish the very rare claim of actual innocence. *See Turner v. Calderon*, 281 F.3d 851, 881 (9th Cir. 2002) (explaining that the petitioner's "self-serving statement, made years later," was insufficient to support the petitioner's claim). In addition, Sawyer confirmed his guilt through the solemnity of a plea colloquy.

In light of all evidence, including Sawyer's testimony that he purchased gloves at a convenience store before going to the victim's residence because Stephen did not want to leave fingerprints behind, gave Stephen his pocketknife while Stephen was attacking the victim, stabbed the victim four times in the chest, and wrote a note at the scene, Sawyer fails to demonstrate factual innocence. As noted by the Nevada Court of Appeals, in affirming the denial of Sawyer's gateway claims of actual innocence, "[a]lthough Sawyer testified that Stephen directed him to do these things and that he believed the victim was already dead when he stabbed him, the district court found Sawyer was 'unreliable and incredible in a general sense,' because he had given a number of

inconsistent accounts of how the murder occurred." (ECF No. 119-10 at 7-8.) The Court finds that Sawyer has not established a gateway claim of actual innocence.

**B. Relation Back**

A new claim in an amended petition that is filed after the expiration of the Antiterrorism and Effective Death Penalty Act ("AEDPA") one-year limitation period will be timely only if the new claim relates back to a claim in a timely-filed pleading. Fed. R. Civ. P. 15(c). An untimely amendment properly "relates back to the date of the original pleading" as long as it arises out of the same "conduct, transaction, or occurrence." *Id*. "[R]elation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005) (citation modified).

New claims in an amended habeas petition do not arise out of "the same conduct, transaction or occurrence" as prior claims merely because they challenge the same trial, conviction, or sentence. *Mayle*, 545 U.S. at 661; *Hebner v. McGrath*, 543 F.3d 1133, 1134 (9th Cir. 2008). Rather, to properly relate back, a new claim must arise from the same collection of facts alleged in the earlier petition. *See Mayle*, 545 U.S. at 661; *Schneider v. McDaniel*, 674 F.3d 1144, 1151 (9th Cir. 2012) (holding that one shared fact in two divergent legal theories was "not sufficient to conclude that they arise out of a common *core* of operative facts."). An amended habeas petition "does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type" from those alleged in the timely petition. *Mayle*, 545 U.S. at 650.

**1. Ground 1(A)**

In Ground 1(A), Sawyer alleges that he did not enter a knowing and voluntary guilty plea, because Stephen coerced him into pleading guilty. (ECF No. 98 at 16-17.) Sawyer argues that Ground 1(A) of the Fourth Amended Petition relates back to Ground 8 of the timely filed First Amended Petition, which alleges that Sawyer's guilty plea was not knowing, intelligent or voluntary, because his "capacity to enter a guilty plea was

compromised by the controlling relationship with [Stephen].” (ECF No. 9 at 77-78.) Although Ground 8 discusses competency, Sawyer includes discussion of Dr. Bittker’s testimony regarding Stephen’s controlling influence over Sawyer and that Sawyer falsely confessed.

The Court finds that Ground 1(A) is tied to the same core operative facts as alleged in Sawyer’s timely filed First Amended Petition. Relation back does not require that “the facts in the original and amended petitions be stated in the same level of detail.” *Ross v. Williams*, 950 F.3d 1160, 1168 (noting that relation back may be appropriate if the later pleading expands or amplifies the facts alleged in the earlier pleading and stating that “[s]ufficient correspondence exists if two claims arise out of the same episode-in-suit.”).

**2. Ground 2(E)**

In Ground 2(E), Sawyer alleges that counsel rendered ineffective assistance for giving inaccurate advice about suppressing Sawyer’s confession. He alleges that counsel failed to raise an argument that Stephen coerced him to plead guilty in the motion to suppress Sawyer’s confession and failed to advise him accordingly. Sawyer argues that Ground 2(E) relates back to Ground 8 of his First Amended Petition, which alleges:

> Counsel also advised Sawyer that his statement would not be suppressed. Counsel made this pronouncement without having done any investigation or without having an expert evaluate Sawyer to see whether his confession was, in fact, voluntary or the product of coercion and mental illness.

(ECF No. 9 at 80.) Sawyer contends that the facts underlying Ground 2(E) do not differ in type as those alleged in his First Amended Petition.

The Court finds that Ground 2(E) of the Fourth Amended Petition, while presenting a different legal theory, is tied to the same core of operative facts as alleged in Sawyer’s timely-filed petition. *See, e.g.*, *Nguyen v. Curry*, 736 F.3d 1287, 1296-97 (9th Cir. 2013) (ineffective assistance claim based on failure to raise double jeopardy related back to timely-raised substantive double jeopardy claim), *abrogation on other grounds recognized by Ross*, 950 F.3d at 1168.

### C. Exhaustion and Procedural Default

Respondents assert that Grounds 1(A), 1(B), 2(B), 2(D), and 2(E) are unexhausted in state court. (ECF No. 122 at 7.)

A state prisoner first must exhaust state court remedies on a habeas claim before presenting that claim to the federal courts. 28 U.S.C. § 2254(b)(1)(A). This exhaustion requirement ensures that the state courts, as a matter of comity, will have the first opportunity to address and correct alleged violations of federal constitutional guarantees. *See Coleman v. Thompson*, 501 U.S. 722, 730-31 (1991). “A petitioner has exhausted his federal claims when he has fully and fairly presented them to the state courts.” *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014) (citing *O’Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). To satisfy the exhaustion requirement, a claim must have been raised through one complete round of either direct appeal or collateral proceedings to the highest state court level of review available. *O’Sullivan*, 526 U.S. at 844-45; *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (en banc). A properly exhausted claim “‘must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief.’” *Woods*, 764 F.3d at 1129 (quoting *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)); *Castillo v. McFadden*, 399 F.3d 993, 999 (9th Cir. 2005) (fair presentation requires both the operative facts and federal legal theory upon which a claim is based).

The Supreme Court has recognized that under certain circumstances it may be appropriate for a federal court to anticipate a state-law procedural bar of an unexhausted claim, and to treat such a claim as technically exhausted but subject to the procedural default doctrine. That is, “[a]n unexhausted claim will be procedurally defaulted, if state procedural rules would now bar the petitioner from bringing the claim in state court.” *Dickens v. Ryan*, 740 F.3d 1302, 1317 (9th Cir. 2014). The effect of a procedural default is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the

> alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750; *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986). To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" her efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the question of prejudice, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause, to overcome the procedural default of a claim of ineffective assistance of trial counsel. "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial counsel if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (regarding the showing necessary to overcome a procedural default under *Martinez*). Nevada law requires prisoners to raise ineffective assistance of counsel claims for the first time in a state petition seeking postconviction review, which is the initial collateral review proceeding for the *Martinez* rule. *See Rodney v. Filson*, 916 F.3d 1254, 1259-60 (9th Cir. 2019).

**1. Ground 1(A)**

Respondents argue that Ground 1(A) is unexhausted because Sawyer did not fairly present this claim to the state appellate court. Sawyer raised this claim in his second

state habeas petition. The Nevada Court of Appeals affirmed the denial of Sawyer's second state habeas petition as untimely, successive, and procedurally barred, finding that he failed to demonstrate good cause to excuse procedural default. (ECF No. 119-10.)

The Court determines that Sawyer never properly presented Ground 1(A) to the state appellate court and the Court has already determined that Sawyer failed to demonstrate actual innocence. "Submitting a . . . claim to the state's highest court in a procedural context [where] its merits will not be considered" does not satisfy the fair presentation requirement for exhaustion. *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994), citing *Castille v. Peoples*, 489 U.S. 346, 351. Ground 1(A), therefore, is unexhausted.

Because this is not an ineffective assistance of counsel claim, *Martinez* does not apply. Even if *Martinez* did apply to a claim of involuntary and unknowing guilty plea, *Martinez* is still limited to those cases in which the first opportunity to raise such a claim is the initial review collateral proceeding. Nevada does not require a claim of an involuntary and unknowing plea to be raised only in a postconviction habeas corpus petition, nor does Nevada fail to provide a meaningful opportunity to raise such a claim before filing a postconviction habeas corpus petition. Therefore, the Court will grant Respondents' Motion with respect to Ground 1(A) and dismisses the claim.

**2. Grounds 1(B), 2(B), 2(D), and 2(E)**

Similar to Ground 1(A), Grounds 1(B), 2(B), 2(D), and 2(E) were not properly presented to the state appellate court and are unexhausted. It is clear that Sawyer would face multiple procedural bars if he were to return to state court with his unexhausted claims. *See, e.g.*, NRS §§ 34.726, 34.810. Sawyer advances only *Martinez* as a basis for excusing the anticipatory default of his ineffective assistance of counsel claim. The Court will consider Grounds 1(B), 2(B), 2(D), and 2(E) technically exhausted on that basis.

In their reply brief, Respondents argue that Sawyer cannot show cause and prejudice to overcome the default, but they concede the Court may wish to defer ruling

whether the claims are procedurally defaulted until the parties have submitted their briefs on the merits. (ECF No. 133 at 14.) The Court concludes that, because the analysis of prejudice under *Martinez* is necessarily intertwined with the merits of the claims, the Court defers consideration whether Sawyer can overcome the procedural default of his claims of ineffective assistance of counsel in Grounds 1(B), 2(B), 2(D), and 2(E), until after the parties have submitted the remainder of their briefs on the merits of the claims.

**D. Cognizability under *Tollett***

In Ground 2(A), Sawyer alleges trial counsel rendered ineffective assistance for failing to investigate his account of the facts. In Ground 2(C), Sawyer alleges trial counsel failed to consult with a mental health expert to evaluate Sawyer's competence. In Ground 2(D), Sawyer alleges trial counsel failed to set up a meeting with the police to develop corroborating evidence. In Ground 2(E), Sawyer alleges that trial counsel gave him inaccurate advice about suppressing his confession. Respondents move to dismiss Grounds 2(A), 2(C), 2(D), and 2(E), arguing that such claims are not cognizable under *Tollett v. Henderson*, 411 U.S. 258 (1973) because the claims allege pre-plea errors.

In *Tollett*, the Supreme Court of the United States held that "when a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.* at 267. A petitioner may only attack the voluntary and intelligent nature of the guilty plea. *Id.*

An exception to this general rule is "that a habeas petitioner may 'attack the voluntary and intelligent character of the guilty plea' based on pre-plea ineffective assistance of counsel 'by showing that the advice he received from counsel was not within the' 'range of competence demanded of attorneys in criminal cases.'" *Mahrt v. Beard*, 849 F.3d 1164, 1170 (9th Cir. 2017) (quoting *Tollett*, 411 U.S. at 267-69). The court in *Mahrt* clarified that this exception to the *Tollett* bar is not limited to incompetent advice from counsel and extends to instances in which "the action, or inaction of counsel prevent[ed] petitioner from making an informed choice whether to plead." *Id*. In *Missouri v. Frye*, 566

U.S. 134 (2012) and *Lafler v. Cooper*, 566 U.S. 156 (2012), the Supreme Court concluded that despite the lack of a right to a plea offer and the ultimate receipt of a fair trial, a defendant had the right to effective assistance of counsel during pre-trial plea negotiations, including as to plea offers that lapse or are rejected.

Because it is arguable that Sawyer alleges that his trial counsel's incompetent advice and/or "the action, or inaction, of counsel prevent[ed] [him] from making an informed choice whether to plead," the Court finds that Grounds 2(A), 2(C), 2(D), and 2(E) are not barred under *Tollett*.

## IV. MOTION FOR EVIDENTIARY HEARING

Sawyer moves for an evidentiary hearing on his gateway claim of actual innocence, and, in the alternative, whether he can overcome procedural default under *Martinez*. (ECF No. 128.) Evidentiary hearings are authorized in federal habeas corpus actions by Rule 8 of the Rules Governing § 2254 Cases. However, an evidentiary hearing is not required if the issues can be resolved by reference to the state court record. *See Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir. 1998) ("It is axiomatic that when issues can be resolved with reference to the state court record, an evidentiary hearing becomes nothing more than a futile exercise."); *see also Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."). Sawyer does not show that factual development by an evidentiary hearing is warranted. The Court resolves Sawyer's argument of actual innocence on the briefing of the parties and on the extensive record before the Court without need for further factual development.

With regard to whether any of Sawyer's claims are barred by the procedural default doctrine, as explained above, the Court will not address those issues until the parties have filed their answer and reply, and the merits of all Sawyer's remaining claims have been briefed. Therefore, Sawyer's request for an evidentiary hearing concerning issues related to excusing procedural default under *Martinez* will be denied without prejudice to Sawyer again requesting such an evidentiary hearing in a motion for evidentiary hearing

filed in conjunction with his reply.

## V. MOTION TO EXTEND

Sawyer seeks an extension of time to file his reply in support of his motion for evidentiary hearing. (ECF No. 136.) The Court finds that Sawyer's request is made in good faith and not solely for the purpose of delay, and therefore, good cause exists to grant the motion to extend.

## VI. MOTION TO FILE EXCESS PAGES

Sawyer requests leave to file a 42-page opposition to Respondents' Motion to Dismiss which exceeds the page limit imposed by the Local Rules of Practice. (ECF No. 127.) The Court finds good cause exists and grants Sawyer's motion to file excess pages.

## VII. CONCLUSION

It is therefore ordered that Respondents' Motion to Dismiss (ECF No. 122) is granted, in part, and denied, in part. Ground 1(A) is dismissed as untimely.

It is further ordered that the Court defers consideration of whether Sawyer can demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1, to overcome the procedural default of Grounds 1(B), 2(B), 2(D), and 2(E) until the time of merits review. Respondents may reassert the procedural default arguments with respect to those claims in their answer.

It is further ordered that Petitioner's Motion for Hearing (ECF No. 128) is denied without prejudice.

It is further ordered that Petitioner's Motion to Extend (ECF No. 136) is granted *nunc pro tunc*.

It is further ordered that Petitioner's Motion for Leave to File Excess Pages (ECF No. 127) is granted.

It is further ordered that Respondents will have until September 22, 2026, to file their answer.

It is further ordered that Sawyer has 60 days after service of Respondents' answer to file his reply.

DATED THIS 27th Day of July 2026.

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE